58 N.J. Super. 54 (1959)
155 A.2d 282
HELEN C. CAHILL, PLAINTIFF-APPELLANT,
v.
MARY M. MONAHAN, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JOHN F. MONAHAN, DECEASED, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 26, 1959.
Decided November 9, 1959.
*55 Before Judges GOLDMANN, CONFORD and FREUND.
Mr. Joseph F. Walsh argued the cause for appellant (Messrs. Bracken & Walsh, attorneys).
Mr. John F. Lynch argued the cause for respondent (Messrs. O'Mara, Schumann, Davis & Lynch, attorneys; Mr. Lynch and Miss Rose Marie Cassaro, of counsel and on the brief).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiff appeals from an adverse judgment of the Chancery Division determining that the precatory language appearing in her father's will did not create a trust in her favor.
*56 Testator married Laura Carverry in 1899. She died in 1922, leaving as survivors her husband and a daughter (plaintiff). In 1923 he married defendant, and the issue of that marriage was a daughter, Jeanne Monahan (now Ward). At the time of testator's death on June 24, 1950 plaintiff was 50 years old and her half-sister Jeanne 25. His will, prepared by an attorney and executed on January 10, 1941, is quite brief. After revoking all prior wills, it provided as follows:
"Second I give devise and bequeath all the rest of my property, whether the same be real or personal, or of whatsoever nature or wheresoever situate, or to which I may be entitled fully and completely, to my dearly beloved wife, Mary M. Monahan.
Third It is my wish and desire that my dearly beloved wife always provide for my two beloved daughters Helen C. Cahill and Jeanne F. Monahan."
Defendant widow was appointed sole executrix.
Decedent had operated a masonry business known as Monahan Stone Company (now known as Monahan-McCann Stone Company), of which he owned 499 shares. He also owned stock valued at about $150 in another company. Defendant claims that testator made a valid inter vivos gift of all these shares to her in October 1948, so that they did not become assets of the estate. According to her, the value of the estate was $6,710.69 before administration expenses, debts, inheritance taxes, etc. In March 1952 defendant established a trust of one-half the Monahan-McCann shares for the benefit of Jeanne, appointing herself trustee and income beneficiary for life, with the absolute right to vote the shares so long as she lived. The remaining shares were given to defendant's daughter by a previous marriage, Dorothy McCann, who agreed that she would not transfer, assign or encumber the stock in any way as long as defendant lived, and that defendant would have the right to all income as well as the right to vote the shares for life.
Plaintiff lived with her father and stepmother until she married Dr. Lawrence Cahill in 1928. The marriage was *57 a failure, and when plaintiff separated from her husband in 1931 she returned to live in her father's home. Soon after the separation she turned to alcohol and the company of companions whom her father considered entirely unfit. He strongly condemned her drinking companions and way of life, but was unsuccessful in correcting her ways. Finally, in 1945 he had her committed to the House of Good Shepherd, in Morristown, N.J. Toward the end of her stay there he wrote her that there were some things he would have to insist on if she expected to be released and return home, since he was getting too old to put up with any more of her "depradations":
"First of all, I want to be sure that you are repentent for all of the wrongs you have done. There is no use for me to go into details telling you of them as you know them all yourself, and they are many and shameful. You must promise Almighty God that you will never associate with the low class of people you have been associating with.
Your so-called friends who were the lowest type that anybody ever knew, only used you for the money you spent on them. Even with all of the money you had to spend you were always in debt. * * *
You are now out of debt and have a nice tidy bank account to your credit; your jewelry is out of the pawn shop, and your income tax is paid.

* * * * * * * *
* * * Don't be a fool all of your life. Try and improve your way of living. I am giving you a chance to regain your respectability, and I hope you will take advantage of it.

* * * * * * * *"
In her reply plaintiff assured her father that she meant to lead an entirely different life and would do her best to make up for the heartaches and worries she had caused him. She said she no longer had a desire for drinking or smoking. She hoped she would be home shortly and have the opportunity of proving to him that she would stay away "from those who are not for my good."
Soon after this letter plaintiff was released in her father's custody and returned to live with him. Despite her resolutions she resumed her associations and drinking habits. *58 Finally her father put her out of the house after she had spent some four or five days over the Labor Day weekend with her companions, without communicating with him. Upon hearing of her father's action plaintiff said, "I am very glad to hear that." She went to live with one Van Brunt, and stayed with him until he died shortly after this action was instituted. The two moved from one cheap rooming house or hotel to another, plaintiff paying for the rent, food and other expenses, including alcoholic beverages. During all her years with Van Brunt he did not work, but looked to plaintiff for support. She spent a good deal of her time in saloons and in association with friends for whom she would purchase drinks.
In the period between her separation from her husband and her commitment to the home plaintiff had managed to spend whatever funds she had. This included the principal of a mortgage her father had given her, as well as an income of $60 she received each week, representing $50 support paid by the husband and $10 that came to her from an uncle's estate. She also pawned her jewelry and incurred minor debts. (This explains the reference in her father's letter.) Following her release from the home she dissipated the bank account her father had built up for her, consisting of at least $1,500, as well as her weekly income.
After leaving her father's house in 1947 plaintiff never communicated with him for the rest of his life. Although she corresponded with defendant  her postcards closing with expressions of love  there was no note of affection for her father.
One more fact should be mentioned. Other than supplying plaintiff with a home under his own roof from 1931 to 1947, except for the eight months at the House of Good Shepherd, testator never gave plaintiff any money. Nor did he give her money or provide for her in any way after he put her out of his home.
The facts just stated find their support in plaintiff's own testimony, originally given on deposition and admitted in *59 evidence; the exchange of letters while plaintiff was in the House of Good Shepherd; postcards she had written to defendant after leaving her father's home; and her oral testimony at the trial.
By her complaint plaintiff sought to compel the payment of monies allegedly due her under her father's will, to have defendant account for the distribution of the proceeds of the estate and, further, for an order determining what amount will constitute a proper sum to establish the care which plaintiff claims was intended under the provisions of the will. Defendant, by way of counterclaim, sought a judgment construing the will and advice concerning her duty under paragraph Third thereof. The pretrial order declared that the "basic issue" to be determined was the construction of paragraph Third  did it constitute a mandatory direction to defendant to provide for plaintiff? The order went on to recite that ancillary to this issue, in the event of a ruling favorable to plaintiff, was the question of what contributions defendant would be required to make and what money was presently due and payable to plaintiff. Also subordinate to the main question was the additional issue of the size of decedent's estate at the time of his death, and this, in turn, depended on whether certain inter vivos gifts (the reference being to the shares of stock) allegedly made to defendant were valid. The parties agreed at pretrial that the first matter to be heard and determined was the construction of the will, and only in the event of a ruling favorable to plaintiff on that issue would proofs be taken as to the remaining issues.
Accordingly, the case tried before the Chancery Division judge related solely to the basic issue. There is nothing before this court as to the size of decedent's estate or the validity of the inter vivos gifts. The judgment under appeal construed testator's will as follows:
"1. It was the intention of testator, as expressed in his will, to bequeath to the defendant, his wife, absolute and unconditional ownership and control of the residue of his estate.
*60 2. It was not the intention of testator to create a trust or legal obligation in favor of plaintiff or Jean Monahan Ward, by his said will, and Paragraph Third of said will was intended merely as an admonition, not amounting to an imposition of a trust or mandatory direction.
3. It was not the intention of testator to impose upon defendant any legal obligation to supply money or funds to plaintiff under the circumstances revealed by the evidence herein.

* * * * * * * *"
The complaint was dismissed without costs, and the counterclaim for instructions granted.
In his oral decision at the close of the testimony the trial judge found the "clue" to his determination "in the circumstances which existed at the time when this will was written [January 1941] and the circumstances that continued to exist up until the date of the testator's death in 1950." He said that the controlling reason for arriving at his conclusion that it was testator's intent to give the residue of his estate to his widow outright, and not to set up a trust in favor of one or both of his daughters, was testator's concern that "the one thing Helen Cahill must not have was money which would permit her to continue in the habits of her life that she had formed and to permit her to use that money in the support and maintenance * * * of persons whom the father manifestly believed were exerting upon her an influence which eventually resulted, to all intents and purposes, in ruining the lady's life."
Plaintiff's single contention is that the precatory language of paragraph Third created a trust in her favor. In this she relies solely on the opinion of this court in Bankers Trust Co. v. N.Y. Women's League for Animals, 23 N.J. Super. 170 (App. Div. 1952). She incidentally cites a line of cases (considered in the Bankers Trust case) which, it is asserted, establish it as "settled doctrine that unless a will indicates otherwise, the expression of a desire on the part of the testator that a bequest be applied to a particular purpose creates a trust."
Some reliance is also placed upon the language of the trial court in stating that it could carry out testator's intent *61 only by construing the will "to be an outright gift to the widow with an admonition, not in any sense amounting to a trust, that in the event the situation arises, that the widow is bound morally to see that the daughter, Helen Cahill, and the other daughter, Jeanne M. Ward, are not in actual want * * *." The argument that such an admonition is tantamount to creating a legal duty to provide for plaintiff is clearly without merit. The whole point of the so-called precatory trust doctrine is to distinguish those cases where the obligation is moral from those where it is legal.
We had occasion to review the precatory trust doctrine, particularly in its New Jersey aspect, in the Bankers Trust case, 23 N.J. Super., at pages 178-179. As was said there, the earlier view of the English and American courts was that if the testator expressed a desire that a certain disposition be made of the property passing under his will, this was sufficient, in the absence of peculiar circumstances, to create a trust. We noted that not only had the English courts overruled the doctrine established in their earlier cases, but the overwhelming majority of courts in the United States had adopted the more modern view, which is that mere precatory expressions do not in themselves carry the force of command; to determine whether the testator intended to impose enforceable duties, one must look to manifestations of interpretation contained in the will, construed under general principles. In the modern view the question is one of interpretation of a particular will  that of ascertaining the intention of the testator. 1 Scott on Trusts (2d ed. 1956), § 25.2, p. 193 et seq., and see particularly notes 6 and 7 on pages 196 and 197; 6 N.J. Practice (Clapp, Wills and Administration (1950), § 264, p. 12; 2 Restatement of the Law of Trusts 2d (1959), § 25, p. 69.
New Jersey early adopted what is now clearly the minority view. See the cases cited in the Bankers Trust decision, above, 23 N.J. Super., at pages 178-179; and see Clapp, op, cit., above, and Scott, op. cit., above, note 6, at page 197. In this connection it is to be observed, however, that there *62 are a number of cases in which precatory words were not accorded the stature of a legal command by New Jersey courts. See, for example, Cranford Trust Co. v. Robus, 137 N.J. Eq. 266 (Ch. 1945); Brown v. Turpan, 122 N.J. Eq. 305 (Ch. 1937); Steinhart v. Wolf, 95 N.J. Eq. 132 (Ch. 1923); and see also Chancellor Green's acceptance of the modern rule in the very early case of Van Duyne v. Van Duyne, 14 N.J. Eq. 397 (Ch. 1862), whose decision was reversed on appeal, but without opinion, in 15 N.J. Eq. 503 (E. & A. 1863). These indicate that words of recommendation, request, wish or desire have not uniformly been held to be mandatory and to create a trust, or to limit a prior bequest, devise or power. A review of all the cases indicates nothing more than that some courts based their decision on the intent of the testator, while others followed the older English view, thereby in effect disregarding the guidepost of the testator's intent which has for so long served our courts in the area of testamentary construction.
In the Bankers Trust case the N.Y. Women's League for Animals had suggested that Marx v. Rice, 1 N.J. 574 (1949), had overturned the earlier English doctrine that had been followed by so many of our courts. We were of the cautious opinion that the Supreme Court had not overruled the precatory trust doctrine sub silentio, and had done nothing more than "more accurately define" that doctrine. The present appeal has given us an opportunity to reconsider the Marx decision in the light of the cases preceding it and the authorities.
The testator in Marx gave his wife a general power of appointment. By a subsequent paragraph he "requested" the donee to make such donations as she might "deem proper" to such charitable institutions in Essex County, N.J., as she might select. The following language then appears in the will:
"* * * and I do further request her in case she shall exercise the power of appointment by will which I have hereinabove given her, to include among the beneficiaries by her to be designated such *63 of my own blood relations as she may deem worthy to be the recipients of her bounty."
The widow appointed part of the fund in favor of testator's blood relations. The contention on appeal was that the quoted provision was mandatory and converted what would otherwise be a general power into a power in trust for the collateral line of the donor, thereby prohibiting the donee from designating any beneficiaries who were not of that line. Our Supreme Court refused to interpret the will in this manner, stating
"The word `request' was not used here in a mandatory sense. It may be used as a command or an entreaty depending upon the context in which the word is inserted, and the circumstances attendant upon its use. However, the real test is whether or not the testator intends, by his language, to control the disposition of his property. 1 Page on Wills, § 91, p. 199. We conclude that here it was not so intended." (Italics ours) (at pages 582-583 of 1 N.J.)
There can be no question that the court in Marx considered the entire will and attendant circumstances in arriving at testator's intention. Although prior decisions of New Jersey courts were not referred to, the obvious import of the Marx decision was to depart from any pat formula which would establish a trust whenever the testator expressed a desire or request that a bequest be applied to a particular purpose. Instead, it emphasized anew the principle which underlies all cases involving the construction of wills: it is the testator's intent, as determined from the will as a whole and the surrounding circumstances  "the context in which the word is inserted, and the circumstances attendant upon its use"  which governs. Scott considers Marx v. Rice as placing New Jersey among those states which accept the majority view. Scott, op. cit., page 200, note 10.
We now consider the Marx case as clearly expressing the philosophy of the modern rule, requiring a case-by-case determination of the import of the precatory language without any presumption in favor of a trust arising therefrom.
*64 Although our approach to Marx v. Rice in the Bankers Trust case was one attended by a measure of circumspection, we in fact proceeded to consider the testamentary language there involved in the light of the entire will and the attendant circumstances. We were clearly interpolating the testator's intention, in accordance with the modern view.
We hold, therefore, that where a testator uses language expressive of desire rather than of command, the question in each case is whether he intended to impose a legal duty upon the legatee to carry out the desired purpose, or whether he meant to leave the legatee free to carry it out or not as he should choose, even though testator hoped he would carry it out. In each case the court, in reaching its determination, will examine the whole of the will and deal with it in the light of all the circumstances. See 1 Scott on Trusts (2d ed 1956), § 25.2, p. 194. As was said in Busch v. Plews, 12 N.J. 352, 358 (1953), courts today "readily shed the tyranny of labels and justly strain to ascertain, and effectuate, if lawful, the overriding plan and purpose of the testator as gathered from the language of his entire will and the attendant circumstances."
Our examination of the language of the present will in the light of the facts and circumstances surrounding its execution clearly demonstrates, as the trial court found, that testator did not intend to create a trust under paragraph Third. Before the will was drawn in 1941, testator had had ten years of experience with what he considered the wayward life led by his daughter. He bitterly opposed her addiction to alcohol, her companions, and the expenditure of all her substance on drink. In that period he gave her shelter, but no money. He knew in 1941, as well as he ever would, the weakness and proclivities of his daughter. The years which followed proved only too well that she had not changed her ways.
The facts and circumstances we look to are those which existed prior to and at the time of the making of the will. Our reference to what came after merely completes the *65 picture and can only be considered as lending some color to the situation obtaining at the time the will was executed. We do not mean to imply that circumstances postdating the will may in themselves determine testator's intention at the time of execution.
Defense counsel places some stress on an analysis of earlier decisions which, it is contended, demonstrates that where it was held that a trust was created, testator's wish or desire was expressed either in the same sentence as the bequest or devise of the property to which the mandatory direction was to apply, or in the same paragraph; or it was made manifest by other clear language that it was testator's intent to impose the mandatory command and attach it to the property disposed of by him. By way of example, we are referred to the testamentary language in First-Mechanics National Bank, etc. v. First-Mechanics National Bank, etc., 137 N.J. Eq. 106 (Ch. 1945); Ryder v. Myers, 113 N.J. Eq. 360, 361 (Ch. 1933); Deacon v. Cobson, 83 N.J. Eq. 122 (Ch. 1914); Cox v. Wills, 49 N.J. Eq. 130 (Ch. 1891); Eddy v. Hartshorne, 34 N.J. Eq. 419 (Ch. 1881); Van Duyne v. Van Duyne, above, 15 N.J. Eq. 503 (E. & A. 1863), reversing without opinion 14 N.J. Eq. 397 (Ch. 1862). See also Hedges v. Russell, 1 N.J. Super. 434 (Ch. Div. 1948), where the clause expressing testator's "request" referred back to the property given her in an immediately preceding clause. The trial judge observed that the present will differs from the wills in those cases, in that the provision giving the residue of the estate to the widow outright was separate and apart from the provision which plaintiff contends sets up a mandatory trust.
The gift of the residue to testator's wife in paragraph Second is unquestionably an absolute one, without condition or proviso, and unburdened of any charge. It is only in paragraph Third that there is an expression of a distinctly separate thought: testator's "wish and desire" that his wife always provide for his two daughters. There is no *66 reference to the preceding absolute gift. The very structure of the will contra-indicates the intention to erect a trust.
However that may be, there is an insurmountable obstacle to creating a mandatory trust here under any circumstances. Even the earlier cases required not only that the testator wish or desire something to be done, but what he wished or desired had to be specific both as to the subject matter of his bounty and the object thereof. A trust requires a specific res, and where there is no specific res, there can be no trust. See Deacon v. Cobson, above, 83 N.J. Eq., at page 124; Ryder v. Myers, above, 113 N.J. Eq., at page 363. As was the case in Steinhart v. Wolf, above, testator designated no definite part or amount of his estate from which plaintiff was to derive a benefit. The court there said
"Furthermore, it is the well-settled rule that an implied trust will not arise unless the person or object intended to be benefited thereby is properly and definitely described, and the amount of property to which the trust shall attach is sufficiently defined, and this is especially so where a construction creating such a trust would be a contradiction of the terms in which the preceding bequest is given, or where, from all the circumstances, it is more probable that testator meant by the expression he employed to communicate a mere discretion. Eberhardt v. Perolin, 48 N.J. Eq. 592; Lew. Trusts (3d ed.) 167, 168, 171 &c." (95 N.J. Eq., at page 135)
Testator's wish and desire that the widow provide for his daughter was not a sufficient identification of the trust res to warrant the imposition of a trust.
The judgment is affirmed.